UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| JAMES M. PELANT, | Civil No. 05-1173 (PJS/RLE) |
| Plaintiff, | |
| | MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION |
| v. | FOR SUMMARY JUDGMENT |
| PINNACLE AIRLINES, INC. | |
| Defendant. | |

Steve G. Heikens, HEIKENS LAW PRACTICE, 10 South Fifth Street, Suite 700, Minneapolis, MN 55402, for plaintiff.

W. Chris Harrison, PINNACLE AIRLINES, INC., 1689 Nonconnah Boulevard, Suite 111, Memphis, TN 38132, for defendant.

On January 16, 2004, plaintiff James M. Pelant, a manager employed by defendant Pinnacle Airlines, Inc. ("Pinnacle"), went into his office, closed the door, and "audited" a bag of envelopes containing liquor-sales receipts collected by Pinnacle flight attendants. Pelant had been auditing liquor-sales receipts without incident for several months, but this time, unbeknownst to him, something was different: Two employees who had grown suspicious of Pelant's closed-door audits had counted the envelopes before giving them to him. Those same employees counted the envelopes again immediately after Pelant's audit and found that about 30 envelopes containing about $1254 in cash were missing. The employees immediately reported the missing receipts to Pinnacle, Pinnacle promptly investigated, and Pelant was fired.

Pinnacle alleges that it fired Pelant because of the missing receipts. Pelant disagrees. He argues that he was fired because he was a "whistleblower." In particular, Pelant alleges that,

during the 18 months preceding his firing, he had been making various complaints about the handling of liquor sales by flight attendants. It was this whistleblowing, and not his suspected theft, that was the real cause of his termination, according to Pelant.

Pelant has now sued Pinnacle for retaliation, breach of contract, and promissory estoppel. Pelant cannot recover under any of these theories unless a jury finds that Pinnacle fired him not (or not just) because money went missing on January 16, but because Pelant had been blowing the whistle on the flight attendants. Because no reasonable jury could reach that conclusion, Pinnacle is entitled to summary judgment.

## BACKGROUND

Pinnacle is a regional airline that maintains its headquarters in Memphis and a hub in Minneapolis. At the times relevant to this action, Pinnacle employed three managers at its Minneapolis hub. One of them was Pelant, who was in charge of ground operations, such as putting beverages on planes before flights and cleaning planes after flights. Pelant Dep. 56-57. Pelant reported to Bob Lowe, Vice President of Customer Service. *Id.* at 50; Lowe Dep. 6. A second manager was Lisa Roddy. Her responsibilities included supervising the flight attendants, and she reported to Ted Davies in Memphis, who in turn reported to Phil Reed, another Pinnacle vice president. Reed Dep. 6-8. Roddy was replaced by Wanda DeHaan in October 2003. Pelant Dep. 205, 242; Starck Dep. 55-56; Reed Dep. 24. The third manager — Gary Beek — played little role in the events giving rise to this litigation.

Pinnacle sells liquor on its flights. The liquor is loaded onto the planes by Pinnacle ground employees. The flight attendants dispense the liquor and collect cash from the passengers. After they return to their hub, the flight attendants put the cash that they have

collected into envelopes, write information on the outside of the envelopes (including the amount of cash contained in each envelope), and deposit the envelopes into a safe. Pelant Dep. 191. The flight attendants also report the amount of liquor sales on a log that is submitted to headquarters. Reed Dep. 30; Lowe Dep. 64. Flight attendants earn a commission on liquor sales, and the commission is calculated on the basis of this log. Pl.'s Opp. Summ. J. 4; Miller Dep. 8.

Like every airline, Pinnacle is plagued with discrepancies relating to liquor sales. Throughout the industry, more liquor disappears on flights than flight attendants report sold. Pelant Dep. 200. This discrepancy hurts the bottom line, so, from time to time, airlines try to do something about it.

In the fall of 2002, Pinnacle expressed concern about the discrepancy between the amount of liquor that was being consumed on Pinnacle flights and the amount of liquor that Pinnacle flight attendants were reporting sold. *Id*. at 199. In response, Pelant asked Roddy whether anyone was checking the liquor-sales envelopes that the flight attendants were depositing into the Pinnacle safe. *Id*. at 198. Roddy replied that she did not have time to check the envelopes and invited Pelant to do so. *Id*. at 198. Although Pelant had no direct responsibility for flight attendants, he voluntarily took on the task of "auditing" their liquor-sales envelopes. Pelant conducted one or two audits every month for approximately a year and a half. *Id*. at 90, 198, 212-13; Lowe Dep. 16. Pelant's supervisor — Lowe — knew that Pelant was conducting these audits, Lowe Dep. 16; Pelant Dep. 212-13, and, according to Pelant, never personally criticized him in any way, Pelant Dep. 212-13, 230.

In conducting an audit, Pelant would typically ask Brenda Rivera, a clerical employee, to collect the envelopes from the safe and bring them to him. *Id*. at 201. In April 2003, Rivera

-3-

delegated this task to Anna Lopez, another clerical employee.  Rivera Dep. 12, 14, 41.  Pelant would audit the envelopes by himself, in his office, with his door closed.  Pelant Dep. 210.  Although Lowe knew that Pelant was auditing the envelopes, there is no evidence that Lowe knew that Pelant was doing so by himself behind closed doors.  *Id.* at 213.

Pelant insists that, in the course of his audits, he did not open the envelopes, but merely checked the outside of the envelopes to determine if they had been correctly filled out.  *Id.* at 202-03.  Pelant would look to see whether the total amount of cash reported to be in the envelope matched the amount of liquor reported sold multiplied by the proper price.  Pelant also noted when there were envelopes that reported zero sales.  *Id.* at 202-04.  When Pelant found errors or no-sales envelopes, he photocopied the outside of the envelopes and gave the copies to Roddy (and later to DeHaan).  *Id.* at 205.

Pelant claims that, during the 18 months that he conducted these audits, he was acting as a "whistleblower" on the issue of liquor-sales discrepancies.  According to Pelant, this whistleblowing involved notifying Roddy and DeHaan of the errors made by the flight attendants in filling out the envelopes and notifying them of the unusually high number of envelopes reporting no sales.  The no-sales envelopes bothered Pelant because they were evidence that either the flight attendants were being lazy in not pushing liquor sales or the flight attendants were selling liquor, lying about it, and keeping the cash for themselves.  *Id.* at 203-04.

Pelant argues that he was also blowing the whistle on other problems.  For example, he pointed out to Pinnacle that there was a discrepancy between the liquor sales being reported on the envelopes and the liquor sales being reported on the logs submitted to corporate headquarters.  Pelant Aff. ¶ 5, Pl.'s Opp. Summ. J. 4.  He also reported that, when his employees

-4-

would take unsold liquor bottles off of Pinnacle flights, they would sometimes find that seals had been broken and even that the liquor had been replaced with water or apple juice. Pelant Aff. ¶ 5; Pelant Dep. 226-27. This suggested to Pelant that flight attendants were selling bottles of liquor, refilling the bottles with water or apple juice, failing to report the bottles as sold, and pocketing the cash. Pelant shared these concerns with several Pinnacle employees, including Roddy and DeHaan, Davies (their direct supervisor), Reed (Davies's supervisor), and Lowe (Pelant's supervisor). Pelant Dep. 206-07, 227.

As noted, Pelant conducted his audits and engaged in this whistleblowing for approximately 18 months, up to and including January 16, 2004 — the day on which he was suspected of theft. Pelant believes that, prior to January 16, he last audited the envelopes on January 2. *Id*. at 238. Pelant also remembers that he continued to raise concerns about liquor sales — such as concerns about broken seals on liquor bottles — in other contexts in January 2004. *Id*. at 227-28, 239. Pelant concedes, though, that the concerns that he raised in the weeks leading up to his firing did not differ from the concerns that he had been raising without incident for a year and a half. *Id*. at 240.

Before turning to the events of January 16, two additional facts need be mentioned. First, in December 2003, Pelant received and signed a new Pinnacle Code of Conduct. Pelant Aff. ¶ 9. On the final page, the Code of Conduct states that "[g]ood faith reporting of violations or possible violations of this Code or applicable law will not result in adverse consequences to the person reporting them even if the perceived violations are ultimately proven not to have occurred." Heikens Aff. Ex. 2A at 12. This clause forms the basis of Pelant's breach-of-contract and promissory-estoppel claims.

Second, on January 10, Pelant received his annual performance review from Lowe. Heikens Aff. Ex. 1. Lowe gave Pelant an overall score of 4.55 out of 5, which correlated to "highly successful." *Id*. (Pelant had received a similarly positive annual review from Lowe a year earlier.[1]) Under "Management Skills" (on which Pelant scored 4 out of 5), Lowe wrote, "Jim's honest communications with other groups sometimes creates tension. He needs to encourages [sic] a free flow of information in touchy issues." *Id*. In Pelant's eyes, this sentence is the most damning evidence that he was fired for whistleblowing and not for stealing.

Turning now to the events of January 16: Pelant arrived at work at 8:00 a.m. and attended several meetings. Pelant Dep. 263-64. Earlier in the day, he told Lopez that he wanted to audit the liquor-sales envelopes. Rivera was growing suspicious of Pelant's "audits," so she decided to count the envelopes before Lopez gave them to Pelant. Rivera Dep. 44. After retrieving the contents of the safe, Rivera and Lopez took the bag into a storage room and counted the envelopes. *Id*. at 64. Lopez then brought the bag to Pelant. *Id.* at 68. Rivera testified that Lopez handed the bag to Pelant, *id*., but Pelant contends that Lopez left the bag in his office while he was at a meeting, Pelant Dep. 265.

Regardless, after Pelant returned to his office, he went into his office by himself, shut the door, and audited the liquor-sales envelopes. *Id*. After making copies of some improperly filled-out envelopes, Pelant returned the bag to Lopez. *Id*. at 267. She and Rivera retreated to the storage room, counted the envelopes again, and determined that approximately 30 were missing. Rivera Dep. 69-70. Rivera and Lopez immediately reported their discovery to Gary Beek

---

[1]Although the 2003 review is not in the record, counsel for both sides agreed at oral argument that Lowe conducted it and it was positive.

(another manager at the Minneapolis hub).  *Id*. at 71.  Beek, in turn, relayed the information to headquarters.  *Id.* at 74.

January 16 was a Friday.  On January 19 — the next business day — Lowe and David Baker ("Baker"), the director of internal audit, telephoned Pelant to ask him about his involvement with the liquor-sales envelopes.  Baker Dep. 6-7; Pelant Dep. 89-92.  They informed Pelant that liquor money was missing, that his position was in jeopardy, and that there would be an investigation.  Pelant Dep. 91.  Baker asked Pelant why he had not followed the proper procedure for conducting these reviews, and Pelant indicated that he was not familiar with any procedure other than what he found in the Station Operations Manual.  *Id*. at 90.  Apart from this phone call, neither Lowe nor anyone else from Pinnacle interviewed Pelant in connection with the investigation.  *Id*. at 88-89.

The next day, Pelant found a copy of a procedure entitled "Liquor Cash/Receipts Safe Procedure," along with a signature page, in his inbox.  *Id*. at 97-98.  The procedure requires two managers to be present to open the safe, and further requires that all receipts and cash be transferred to a bank bag, which will immediately be locked, sealed in a Federal Express or Express Mail box, and brought to a Federal Express or Express Mail drop point.  Harrison Aff. Ex. G.  Pelant readily admits that his signature appears on the signature page, Pelant Dep. 100, *see also* Pl.'s Ex. 1 (Docket No. 77), but denies that he had previously seen the other pages, Pelant Dep. 100.

On January 28, Lowe came to Pelant's office and informed him that Pinnacle had determined that funds were missing and that Pelant, as the last person in custody of the money, would be held responsible by being fired.  Pelant Aff. ¶ 17; Pelant Dep. 137-38.  Pelant asked

what could be done to change the termination, and Lowe told him that he could resign.  Pelant Dep. 135.  Pelant ultimately submitted a letter of resignation on February 6.  *Id*. at 134-35.  At oral argument, however, Pinnacle indicated that it does not contend that Pelant resigned willingly.

## ANALYSIS

*A.     Pelant's Claims*

Pelant's complaint asserts three causes of action against Pinnacle: retaliation in violation of Minnesota's Whistleblower statute, Minn. Stat. § 181.932 (2004), breach of contract, and promissory estoppel.

The latter two claims rely on the Code of Conduct that Pinnacle adopted in December 2003.  That Code of Conduct, it will be recalled, promised that "[g]ood faith reporting of violations or possible violations of this Code or applicable law will not result in adverse consequences to the person reporting them even if the perceived violations are ultimately proven not to have occurred."  Heikens Aff. Ex. 2A at 12.  Pelant alleges that the Code of Conduct represented a contract between Pelant and Pinnacle, and that Pinnacle violated this contract by firing him in retaliation for his whistleblowing with respect to the flight attendants' handling of liquor sales.  Alternatively, Pelant alleges that, even if the Code of Conduct was not a contract, it was a promise that he reasonably relied on to his detriment when he continued to blow the whistle on the flight attendants after the adoption of the Code in December 2003 and before his firing in January 2004.

As for the whistleblower claim, Minnesota law prohibits retaliation against an employee who "in good faith, reports a violation or suspected violation of any federal or state law or rule

adopted pursuant to law to an employer or to any governmental body or law enforcement official." Minn. Stat. § 181.932, subd. 1(a). To establish causation, an employee must show that an employer's retaliatory motive played a part in the adverse employment action. *Kipp v. Mo. Highway and Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002).[2] While temporal proximity, without more, is generally insufficient to establish such a causal link, *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc), very close temporal proximity can be sufficient to establish the prima facie element of causation. *See Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832-33 (8th Cir. 2002) (discussing cases where timing either was or was not sufficient to establish causation). At the same time, an employee's intervening misconduct erodes any causal connection based on timing. *Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 852 (8th Cir. 2005)*; Kiel*, 169 F.3d at 1136.

Pelant has problems with all of his claims. For example, his promissory estoppel claim would seem to founder on the fact that 17 of his 18 months of whistleblowing came before adoption of the Code of Conduct, and thus he can hardly claim that he relied on the Code in deciding to blow the whistle. The Court need address only one issue, though, as that issue is dispositive. As Pelant himself concedes, he may not recover on any of his claims unless he can prove that, in firing him, Pinnacle was motivated at least in part by a desire to retaliate against him for blowing the whistle on the flight attendants. This Pelant cannot do.

B.      *Standard of Review*

---

[2]Pelant cites *Kipp* for the proposition that the employer's retaliatory motive need not be the sole motivation. It is not clear whether Pelant means, by this reference, to invoke a mixed-motive analysis under *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), but in any event Pelant must initially provide evidence, whether direct or circumstantial, that retaliation was a motivating factor.

Summary judgment on this or any other issue is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could . . . return a verdict for [the non-movant]."  *Baucom v. Holiday Cos.*, 428 F.3d 764, 766 (8th Cir. 2005).

It is axiomatic, of course, that in considering a motion for summary judgment, a court must resolve factual disputes in favor of the nonmoving party.  *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 585 (8th Cir. 1987).  But this rule does a nonmoving party little good unless he first *creates* a factual dispute.  Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(e)).

It bears emphasizing that *facts* are required to defeat a motion for summary judgment — not "mere conjecture," *ACT, Inc. v. Sylvan Learning Sys. Inc.* 296 F.3d 657, 666 (8th Cir. 2002), not "unreasonable inferences or sheer speculation," *Howard v. Columbia Pub. Sch. Dist.*, 363 F.3d 797, 800 (8th Cir. 2004), and not "conclusory statements in [an] affidavit," *Jeseritz v. Potter*, 282 F.3d 542, 545 (8th Cir. 2002).  True, the nonmovant need not present facts "in a form that would be admissible at trial."  *Celotex*, 477 U.S. at 324.  (Typically, facts are presented in

affidavits, and typically affidavits are not admissible at trial.)  But the facts themselves must "be admissible in evidence."  Fed. R. Civ. P. 56(e).

Finally, it is not enough for the nonmovant to present a few facts — even facts that are admissible in evidence.  Rather, the nonmovant must present enough facts "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  Evidence is not "sufficient" unless a reasonable jury could return a verdict for the nonmovant.  When a defendant has moved for summary judgment,

> the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.  The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Anderson*, 477 U.S. at 252.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial,'" and summary judgment must be granted.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

C.   *Causal Connection*

Pelant claims that there is a genuine issue about whether he was fired by Pinnacle in retaliation for blowing the whistle on the flight attendants.  In his brief, Pelant spins out the following theory:  Pelant had become a thorn in the side of powerful people at Pinnacle — in particular, Roddy (the manager at the Minneapolis hub who supervised flight attendants) and Reed (the executive two levels above Roddy).  These people tolerated Pelant's griping, but,

when the new Code of Conduct took effect in December 2003, these people feared that Pelant's complaints could no longer be ignored, because the Code of Conduct committed Pinnacle to investigating reports of unethical behavior. Thus, it was necessary to get rid of Pelant. A plot was hatched, and, on January 16, Pelant was "set up" to look like a thief.

As described below, this theory is so implausible for so many reasons that no rational trier of fact could accept it. Perhaps recognizing that fact, Pelant changed his theory at oral argument. Rather than claim that he was "set up," Pelant instead suggested that, because of his whistleblowing, Pinnacle was waiting for an excuse — any excuse — to fire him. Pelant concedes that money did indeed go missing from the bag of envelopes on January 16, but surmises that the thief was a Pinnacle employee who snuck into his (open) office while the (unlocked) bag was sitting there waiting for Pelant to return from his meeting. When the money was reported missing, Pinnacle did not care who actually stole it. Pinnacle wanted to fire Pelant because of his whistleblowing, and now it had the excuse it needed.

The question, then, is whether a fair-minded jury, looking at the record as a whole, could reasonably believe either of these stories. The answer is "no." There is not a scintilla of evidence suggesting that either of these theories is true, while there is overwhelming evidence suggesting that Pinnacle fired Pelant for exactly the reason it gave: because money went missing during the January 16 audit.

As an initial matter, Pelant's "whistleblowing" — the whistleblowing that Pinnacle supposedly wanted to punish or silence — consisted almost entirely of telling Pinnacle what it already knew. Pinnacle knew about the discrepancies in the liquor sales. It was an industry-

wide problem. Indeed, according to Pelant, he was spurred to volunteer to audit the envelopes when Pinnacle itself expressed concern about the discrepancies.

Pinnacle also knew about the discrepancy between the envelopes and the logs. Given that the envelopes were submitted to headquarters, and given that the logs were submitted to headquarters, headquarters obviously knew of the discrepancy. Pelant says that he acted as a whistleblower in "highlighting" the discrepancy, but it would be quite extraordinary for a company to fire an employee for telling the company what it already knew. Indeed, the Minnesota Whistleblower Act does not protect employees who merely inform their employers of unlawful conduct of which the employers were already aware. *See Cokley v. City of Otsego*, 623 N.W.2d 625, 632 (Minn. Ct. App. 2001).

Conceding that Pinnacle was already well aware of liquor-sales discrepancies, Pelant argues that he acted as a whistleblower not so much in bringing that problem to Pinnacle's attention, but rather in raising possible *explanations* for the discrepancies. In particular, Pelant suggested that flight attendants may be selling liquor, not reporting the sales, and pocketing the cash — sometimes covering their tracks by filling empty liquor bottles.

Three things should be noted about this purported whistleblowing. First, Pelant's whistleblowing involved trying to help the company stop its employees from stealing. It is hard to imagine why a company would fire someone who tried to protect the company from theft. Second, Pelant was not reporting any actual *evidence* of theft. He never reported that a particular flight attendant stole a particular amount of cash on a particular occasion — the type of report that generally gives rise to whistleblower concerns. Rather, Pelant simply reported what he had *surmised* about the discrepancy. He reported a guess — a theory. Finally, Pelant's theory was

not exactly ground breaking.  It was akin to suggesting that droughts are caused by a lack of rain.  The problem, again, was that Pinnacle's records showed that more liquor was disappearing on flights than the flight attendants were reporting sold.  The first explanation that would occur to anyone is that the flight attendants were either making mistakes or stealing.  In short, Pelant's whistleblowing consisted entirely of suggesting obvious explanations for a well-known problem — hardly the kind of conduct that would put Pelant in the cross-hairs of corporate executives.

There are other problems with Pelant's argument.  The decision to fire Pelant was made by Lowe, his supervisor, after consulting with two other Pinnacle executives.  Lowe Dep. 25, 78.  There is no evidence that the other two Pinnacle executives had even heard of Pelant's whistleblowing before making the decision to fire him.  Lowe, of course, was well aware of the whistleblowing.  He had known of Pelant's audits almost from the beginning, and, according to Pelant, never expressed the slightest displeasure that Pelant was auditing the envelopes or sharing his theories about the cause of the liquor-sales discrepancy.  Indeed, it was Pelant's view that Lowe *didn't care* about the liquor-sales discrepancy — that Lowe had much more important things to worry about.  Pelant Dep. 230.  Not only did Lowe fail to object to Pelant's activities, Lowe gave Pelant two glowing annual assessments — one in January 2003 and one in January 2004.  And yet, according to Pelant, Lowe was secretly conspiring to "set up" Pelant or biding his time hoping that an excuse to fire Pelant would arise.

There are still other problems with Pelant's case.  Pelant claims that he was fired because he had become a thorn in the side of the flight attendants and their supervisors — in particular, Roddy and Reed.  Roddy was, of course, the person who invited Pelant to audit the envelopes; it would be odd for her to be angry at Pelant for accepting her invitation.  Roddy also had been

fired by Pinnacle in October 2003, and thus had absolutely nothing to do with Pelant's January 2004 firing. Pelant Dep. 242. Pelant insists, though, that Reed, one of Roddy's bosses, had seemed "irritated" with him for continuing to raise complaints when Reed had "heard this before." Pelant Dep. 231. Even assuming — implausibly — that such irritation would motivate a Pinnacle executive to orchestrate the firing of a manager whom he did not supervise, there is a gaping hole in Pelant's theory: He was not "set up" by Reed, or anyone who worked for Reed. He was "set up" by Lopez and Rivera. There is no evidence — none — that Lopez or Rivera were working on behalf of Roddy or Reed or anyone else at Pinnacle. And there is no evidence — none — that Reed had anything to do with Pelant's firing.

And finally, there is the matter of timing: Pelant audited the envelopes and complained about the flight attendants for 18 months, and absolutely nothing happened to him. No one even criticized him, with the exception of Reed expressing irritation that Pelant kept raising a complaint that Reed had heard many times before. By contrast, Pelant's suspected theft was reported immediately, an investigation was launched the following business day, and Pelant was fired a couple of weeks later. *Cf. Kiel*, 169 F.3d at 1136 ("Indeed, [plaintiff] had requested a TDD on numerous occasions, but he suffered no adverse employment action until he engaged in abusive, derogatory conduct towards his employer.").

Pelant concedes that Pinnacle has a lot of evidence on its side. But he points to several facts that, in his view, suggest that Pinnacle's claimed reason for firing him was pretextual.

First, Pelant points out that Lowe criticized him on his 2004 annual review for creating "touchy issues" with his "honest communications" and points out that Lowe is the same person who fired him. Pelant interprets the "touchy issues" statement as referring to his complaining

about the flight attendants. And, indeed, a jury could plausibly interpret Lowe's statement as asserting that the *manner* in which Pelant was making his complaints was discouraging "a free flow of information in touchy issues." But, considering the record as a whole, no reasonable jury could find on the basis of this one sentence that Lowe was harboring a desire to fire Pelant for complaining about the flight attendants.

Again, Lowe knew about Pelant's audits and his complaints for at least 18 months, and yet Lowe offered not a single word of criticism. To the contrary, in both January 2003 and January 2004, Lowe gave Pelant very positive annual reviews. Indeed, it is noteworthy that the sentence about which Pelant complains appeared in an annual review that, on the whole, was extremely positive — an annual review that Lowe provided just days before Pelant was accused of stealing. To suggest that Lowe, the author of this report, was giving Pelant a glowing review while secretly harboring animosity toward Pelant for complaining about the flight attendants is exactly the type of "unreasonable inference[] or sheer speculation" that does not defeat a motion for summary judgment. *Howard*, 363 F.3d at 800.

Second, Pelant points to evidence that Pinnacle generally followed a progressive discipline policy, *see* Starck Dep. 7-9, and argues that, in imposing the most severe form of discipline on him for a first offense, Pinnacle proved that it had been waiting for an excuse to get rid of him. But Pelant can point to no other employee suspected of misconduct as serious as theft who was not fired. Pinnacle, by contrast, has pointed to evidence that, in every instance in which an employee has been suspected of theft or dishonesty, that employee was fired. In fact, Lisa Roddy — Pelant's colleague at the Minneapolis hub — was apparently fired in October 2003 for dishonesty. Reed Dep. 24-26.

Third, Pelant claims that other employees violated the policy requiring that the bag of liquor-cash receipts be handled by two managers and were not fired. In particular, he points out that neither Lopez nor Rivera were disciplined for handling the bags by themselves. But there is nothing suspicious about Pinnacle treating someone like Pelant — a manager who had signed the "Liquor Cash/Receipts Safe Procedure"[3] — differently than someone like Lopez or Rivera — clerical employees who had not signed the document and who acted under the instructions of their bosses. Pelant has cited no evidence that the Pinnacle executives who decided to fire him had previously been aware of violations of the policy by a manager and failed to act.

Finally, Pelant points to the fact that various Pinnacle employees have given various descriptions of the reason why Pelant was fired. Some have claimed that he was fired for showing poor judgment. Others have claimed that he was fired for violating the two-manager policy. Still others — including, ironically, Pelant himself, Pelant Dep. 252 — have claimed that he was fired for suspected theft.

The Pinnacle employees to whom Pelant refers were, for the most part, his co-workers and friends. It is obviously difficult for one co-worker to accuse another of theft. Euphemisms are quickly embraced. It was undoubtedly much easier for Pelant's colleagues to cite his poor judgment than to accuse him of being a thief, particularly when his judgment was so poor that it justified dismissal and thus made it unnecessary to reach more difficult conclusions. What is critical is not that the reason for Pelant's dismissal has been described in various ways. What is critical is that Pinnacle employees have been entirely consistent in asserting that Pelant was fired

---

[3] Although Pelant contends that he never read this document, he acknowledges that his signature appears on the signature page.

because of what happened on January 16, and not because he had spent 18 months complaining about the way that flight attendants handled liquor receipts. On this record, no reasonable jury could conclude otherwise.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED that defendant Pinnacle Airlines, Inc.'s motion for summary judgment [Docket No. 49] is GRANTED and plaintiff James M. Pelant's complaint [Docket No. 1, part 2] is DISMISSED WITH PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: August 8, 2006            s/Patrick J. Schiltz
                                 Patrick J. Schiltz
                                 United States District Judge